## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

KAREN POULSEN,

     Plaintiff,

     v.                              Case No. 14-2477-JAR-KGS

HUMANA INSURANCE COMPANY,

     Defendant.

## MEMORANDUM AND ORDER

Plaintiff Karen Poulsen brings this action pursuant to the Americans with Disabilities Act,[1] ("ADA") as amended by the ADA Amendments Act of 2008 ("ADAAA")[2], against her former employer, Defendant Humana Insurance Company ("Humana").  Plaintiff alleges that Humana failed to provide reasonable accommodations in connection with her alleged disability, bipolar disorder, and that her termination from employment was discriminatory and retaliatory in violation of the ADA.  This matter is before the Court on Humana's Motion for Summary Judgment (Doc. 56) on Plaintiffs' claims.  For the reasons discussed in detail below, the Court grants Defendant's motion.

### I.      Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[3]  In applying this standard, the court views the evidence and all reasonable inferences therefrom in

---

[1] 42 U.S.C. § 12101.

[2] Pub. L. No. 110-325, 122 Stat. 3553.

[3] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

the light most favorable to the nonmoving party.[4]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[5]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[6]  An issue of fact is "genuine" if "'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"[7]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[8]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[9]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[10]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[11]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a

---

[4]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[5]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[6]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998)).

[7]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[8]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[9]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[10]*Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)).

[11]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

rational trier of fact could find for the nonmovant."[12]

The facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[13]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[14] The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[15]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[16]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[17]

## II.     Uncontroverted Facts

The following material facts are uncontroverted, stipulated to for the purposes of summary judgment, or viewed in the light most favorable to Plaintiff.

Plaintiff was employed by Humana at its Overland Park, Kansas office from August 26, 2007, to October 8, 2012.  Consumers who receive their health insurance through Humana health insurance plans are referred to as "members."  Plaintiff was first hired as a Clinical Advisor RN/Case Management Nurse.  She was responsible for, among other things, providing members

---

[12]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

[13]*Adams*, 233 F.3d at 1246.

[14]Fed. R. Civ. P. 56(c)(4).

[15]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[16]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[17]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

with guidance at points along the clinical continuum, assessing member health conditions and needs, maintaining accurate documentation, and advising members on health maintenance. Plaintiff's specific job duties included keeping track of Humana members while they were hospitalized, assisting with discharge needs, determining whether members qualified for rehabilitation, long-term care, or skilled nursing facilities, and presenting information to the medical director regarding appropriate level of care for members.  Plaintiff worked primarily as an acute care nurse and was responsible for obtaining clinical information, conducting clinical reviews of members' case files to ensure they met criteria to stay in acute care, and making appropriate referrals to members as needed upon discharge from a facility.

Plaintiff understood that her employment was terminable at will, and signed and acknowledged that she knew where the Humana Associates Work Life Policies and Processes and Humana benefits information was located on Humana's website.  Humana Associate Work Life Policies and Processes outline Humana's applicable employment policies, and include an ADA policy for employees who require medical related accommodations.[18]  The ADA policy states that if an employee makes a request for medical related accommodation, the employee or the employee's manager should notify Humana's ADA coordinator about the employee's need for accommodation.  The ADA coordinator then contacts the employee to work with them to determine whether a reasonable accommodation should and can be provided.

Humana implements a Competency Improvement Plan Guideline, which assists management with addressing employees' behavior, performance, or attendance issues.  Humana uses progressive discipline and counseling for its employees.  With respect to performance issues, employees may receive coaching, depending on the egregiousness of the conduct.  If the

---

[18]Doc. 57, Exs. 2, 4.

performance issues persist after coaching, the employee may be placed on a "Competency and Contribution Improvement Plan" ("CCIP").  A manager is required to consult with Humana's corporate human resources department if they want to issue discipline in the form of a CCIP.  Humana's corporate human resources department is also referred to as "HR4U" or "Shared Services."  Humana's managers may contact HR4U by dialing a toll-free number that connects them to the human resources consultant assigned to that particular business group.  HR4U consultants assist management with performance management, conflict resolution, and reviewing and advising on policies.  HR4U consultants also assist management with drafting the CCIP and provide final approval before a CCIP is administered to an employee.  Once placed on a CCIP, the supervisor will work through the plan with the employee.  If the employee is not progressing on the plan, is not meeting the expectations noted in the CCIP, or fails to meet any of the other policies or guidelines required of them, the employee may be terminated while on the CCIP.

CGX is Humana's proprietary medical management software.  Plaintiff used CGX to chart member information and to direct reports to the regional medical director to gain authorizations for member transfers from one facility to another.  Ordinarily, Plaintiff was also able to call, fax, or email the medical director if CGX was unavailable.

Plaintiff's immediate supervisor from the date she was hired until November 2011 was Manager, Christine Bolton.  During the December 2007 company Christmas party, in what Plaintiff describes as "a bonding moment" between herself and Bolton, Plaintiff shared with Bolton that she had bipolar disorder.  Plaintiff admits that, other than that conversation, she and Bolton never again specifically discussed Plaintiff's bipolar disorder.

### *Plaintiff's 2008 Behavior Issues*

On January 14, 2008, Bolton provided coaching and feedback to Plaintiff after Bolton

received reports that Plaintiff was instructing certain employees not to talk to two co-workers who were members of the collective bargaining unit that represented Humana's nurses.  During the session, Bolton informed Plaintiff that her behavior was inappropriate, unprofessional, and such continued behavior would not be tolerated.

On August 26, 2008, Plaintiff yelled, "shut up" to a co-worker, after the co-worker greeted her with "good morning."  After this incident, Bolton provided coaching and feedback to Plaintiff, again reminding her that her behavior was inappropriate and disruptive.  Plaintiff told Bolton she had not taken her Prozac medication for four days.  Although Plaintiff did not tell Bolton why she was taking Prozac, she testified that she thought that by telling Bolton she had not taken her medication, it might explain her behavior.  Plaintiff further testified that failing to take her medication was not an excuse for bad behavior in the workplace.

On September 2, 2008, Bolton placed Plaintiff on a CCIP for the above-described incidences of inappropriate and unprofessional behavior.[19]  Plaintiff testified that she understood that if she did not cease the inappropriate behaviors outlined in the CCIP, Humana would terminate her employment.  Plaintiff successfully completed the CCIP and was eventually removed from the plan.

### *Violation of Work-at-Home Agreement and Policy*

In 2009, Plaintiff began working as a Utilization Management Nurse.  Clinical Manager Kathy Watkins became Plaintiff's supervisor in or around June 2012.  In or around May or June 2012, Humana implemented the Work-at-Home program.  Plaintiff asked to participate in the program, but never told Watkins that her request was necessitated by any alleged medical condition.

---

[19]Doc. 57, Ex. 11.

The Work-at-Home Policy required participating employees to sign a Work-at-Home Agreement ("WHA"), which outlined the requirements to participate in the program.  As part of the WHA, employees are required to have a separate dedicated secured telephone line, a dedicated DSL or cable line for internet, and use only with Humana-provided equipment. Plaintiff admitted that she read the WHA before she signed it, and understood that she was authorized to use only the Humana-provided telephone line to work from home.  She acknowledged that this requirement was to protect the confidentiality of Humana members' medical information.  Plaintiff also understood that if she violated any aspect of Humana's policies or the WHA, she would no longer be permitted to work from home.

At some point after signing the WHA on May 18, 2012, Plaintiff contacted Humana's IT department and requested to have calls forwarded from her Humana-provided telephone to a non-secured, privately-owned telephone.  On or around May 20, 2012, Watkins received notification from other Utilization Nurses that they were unable to pick up voicemail messages from Plaintiff's Humana-provided work phone.  Humana policy required the passcode for retrieving voicemail messages to be set to the current month plus the last four digits of the employee's phone number so that co-workers are able to retrieve messages from other Utilization Nurses' phones and continue to attend to members' needs when employees are absent.  Watkins discovered that Plaintiff had forwarded her calls from the Humana-provided work phone to Plaintiff's personal, non-secured wireless telephone in violation of paragraph 18 of the WHA.  Plaintiff testified that she made the call to IT to ask to have calls forwarded while "in a manic state."

Watkins counseled Plaintiff regarding her violation of the WHA on or around June 1, 2012.  Watkins removed Plaintiff from the Work-at-Home Program because of the violation of

policy, and that the decision of whether to allow her to resume work from home in the future would be revisited in six months.  Watkins testified that she is unaware of any other employee who has violated paragraph 18 of the WHA, and if any other employee violated paragraph 18, Watkins would have removed them from the program.

While counseling Plaintiff, Watkins expressed concerns about Plaintiff's recent erratic behavior.  According to Watkins, she witnessed Plaintiff stand up in the middle of the cubicles to tell her co-workers to "be quiet" and "shhh."  Plaintiff testified that during the time in question, she "was in a manic state," and therefore unable to refute Watkins' description of her behavior. Plaintiff later emailed Watkins, stating that she "did not see the effect that the medication that doctor prescribe [sic] for weight loss was affecting my behavior," and that she made an appointment with her psychiatrist to get her weight-loss medication adjusted.  Plaintiff was prescribed Wellbutrin and Topamax in April 2012 as part of a medically managed weight-loss plan; she was already taking Prozac at that time.  Although Plaintiff is a registered nurse, she acknowledged in her deposition that she is not a doctor and could not speculate about whether the medications she was taking as part of her weight-loss program were causing the mania or any of the symptoms related to her alleged bipolar disorder.  Watkins testified that Plaintiff told her that she was seeing a psychiatrist and taking medication as part of a weight loss plan, and that she was unaware that Plaintiff suffered from any mental condition at the time she coached Plaintiff about her violations of the WHA.

### *Plaintiff Complains About Noisy Workplace*

Throughout her employment with Humana, Plaintiff often complained to Bolton and Watkins about the noise levels in the workplace.  The work environment has been described as a "cubicle farm" in which employees conducted the majority of their work over the telephone and

on computers in cubicles located in close proximity to each other.  Plaintiff testified that she complained to Bolton about loud co-workers and that she could not do her job because it was so loud that she could not hear her providers over the phone.  When making these complaints, Plaintiff admitted that she never mentioned that her sensitivity to noise was due to or caused by her bipolar disorder.  Instead, she merely referred to her "stress level" as being the cause of her sensitivity to noise in the workplace.

Watkins testified that many employees routinely complained to her about the noise level in the workplace.  Watkins made efforts to accommodate all employees' requests to be moved to a quieter area in the office.  Plaintiff asked Watkins to move her to a quieter work area so that "she could think and be able to do her job."  In or around June 2012, Watkins moved Plaintiff to a less populated area of the office.  Plaintiff testified that she never had any discussions with Watkins about the move being related to her bipolar disorder.

At some point after Plaintiff's move, Humana increased its hiring due to increased membership, and the cubicles near Plaintiff that were once empty were being filled with new employees.  Watkins testified that Plaintiff made no additional requests to move cubicles and remained in the same cubicle through the termination of her employment.  Plaintiff testified that she could not recall asking to be moved to a different location.

### *Plaintiff's Behavior at 2012 Summit*

In June or July 2012, Front Line Leader Michelle Watson became Plaintiff's immediate supervisor.  In August 2012, Humana held its "All Hands Summit" ("the Summit"), a multiple day event where health services nurses from all over Humana's central region traveled to the Overland Park, Kansas, location for training and team building.

On August 21, 2012, the Summit began with visiting nurses coming into the Overland Park office to set up their workstations in available empty cubicles so that they could continue working throughout the event.  As the visiting nurses were setting up in adjacent cubicles, Plaintiff was attempting to work on a time-sensitive portion of her caseload.  Plaintiff testified that the nurses were standing up and carried on a forty-five minute conversation over the cubicles with Front Line Leader Keri Searl.  Plaintiff stood up and loudly shouted, "shut up" to the visiting nurses, after which Searl removed Plaintiff from the floor and took her to a conference room.

Searl reported Plaintiff's outburst to Watson and Watkins and brought them to the conference room.  While there, Watson and Watkins witnessed Plaintiff pacing back and forth, her hair was disheveled and she appeared to be very upset.  Plaintiff made several comments, including a remark that maybe her medication needed to be adjusted and that her "diet pill may be too strong."  Watson and Watkins attempted to discuss the incident with Plaintiff and tried to calm her down.  Plaintiff testified that she remembers being in the conference room and raising her voice, but has no other memory of what else occurred because she "was in a full manic state" at the time.  Watkins counseled Plaintiff that her behavior was inappropriate for the workplace, told her to apologize to the other nurses, and sent Plaintiff home for the day.

On August 23, 2012, Humana continued the Summit in the ballroom at the Marriot Hotel in Overland Park, Kansas.  Employees participated in an icebreaker exercise in which each went to the front of the group and gave information about themself; employees were asked to state something the group did not know about them, and humor was acceptable.  When it was Plaintiff's turn to speak, she told a graphic story about her trip to Las Vegas with her husband. Bolton testified that Plaintiff meowed like a cat, mentioned wearing a cat suit in their hotel suite,

and was explicit about what happened between them.  According to Bolton, Plaintiff moved her hands up and down her body as she explained the cat suit, made a comment about her husband "getting lucky," that "what happens in Vegas stays in Vegas," as well as that "redheads are honest."  Bolton testified that she could tell people in the audience were uncomfortable during Plaintiff's speech.

At some point after this occurrence before the assembled group of nurses at the Marriot, Watkins and Watson informed Bolton of Plaintiff's earlier outburst that occurred on August 21. Bolton recommended that Watkins contact HR4U for guidance as to appropriate disciplinary action to take towards Plaintiff.  Because Watson had recently started her employment with Humana, Watkins exclusively handled the administration of Plaintiff's discipline, and contacted HR4U concerning the August 21 and 23 events.

 Humana's Human Resources Consultant, Christine Chester, was assigned to the Health Services group in Kansas City and consulted with Watkins and Bolton about appropriate discipline to impose as a result of Plaintiff's behavior at the Summit.  Watkins and Watson completed Mandatory Employee Assistance Program Request Forms, which were submitted to Chester for review.  Chester testified that Plaintiff's behavior during the Summit was a terminable offense.  After reviewing Plaintiff's job history, and after consulting with Humana's Employee Assistance Program provider, Chester recommended in lieu of termination, offering Plaintiff a CCIP conditioned upon her active participation in Humana's Employee Assistance Program ("EAP").  Chester provided Watkins with the CCIP and mandatory EAP information to administer to Plaintiff.[20]

---

[20]Doc. 57, Ex. 18

### *2012 CCIP*

On September 14, 2012, Watkins and Bolton met with Plaintiff and informed her that, in

lieu of termination, she was being placed on a CCIP for inappropriate and unprofessional

behavior displayed during the Summit, and that she was required to actively participate in

Humana's EAP, Life Sync, which provides behavior health counseling.  Plaintiff testified that

she understood that, in lieu of termination, she was being offered the CCIP as a one-time

opportunity to continue her employment, contingent upon her agreement to certain conditions,

including but not limited to active participation in the EAP.  The CCIP outlines the conditions

for Plaintiff to continue her employment at Humana, stating:

> Failure to meet the requirements set forth above at any time, either in part
> or in whole, will result in the termination of your employment with
> Humana.  Additionally, other expectations of your role must be met on an
> ongoing basis.  If these expectations are not met, your employment with
> Humana may be terminated.[21]

### *Request for FMLA Leave*

On September 18, 2012, Plaintiff visited her family physician, Dr. Rovenstine, and talked

to him about the stress of her work environment.  Plaintiff testified that Dr. Rovenstine provided

her with a note, in which he explained that Plaintiff had bipolar disorder and relayed the

information Plaintiff told him during their visit.  Plaintiff further testified, however, that she

never gave Dr. Rovenstine's note to Watkins or anyone else at Humana, but planned to once she

was approved for FMLA leave.

Humana's FMLA program is handled by third-party administrator, UNUM.  On

September 20, 2012, Plaintiff contacted UNUM to request intermittent FMLA leave.  Because

the FMLA program is handled by UNUM, neither Bolton nor Watkins had any involvement in

---

[21]*Id.*

the FMLA application process other than receiving a notice when an employee applies for leave. Watkins received notice from UNUM of Plaintiff's application and she informed Bolton.  On September 21, UNUM informed Plaintiff that she needed to return a medical certification from her physician by October 5, 2012, in order for her request for FMLA leave to be approved. Plaintiff did not provide UNUM with the necessary medical certification documents by the deadline, and UNUM gave her an extension until October 12.  Plaintiff was terminated on October 8, 2012, and did not provide UNUM with any of the medical certification documents needed to approve her request for FMLA leave.

### Events Leading to Termination

As a Utilization Management Nurse, Plaintiff had the option to work "on-call" on evenings and weekends, and had been on-call on multiple occasions during her employment with Humana.  On call hours over the weekend ended the following Monday at 8:00 a.m.  Plaintiff was able to complete on-call work from home.  While on call, employees were required to answer pages from the answering service within ten minutes, document information on CGX, and complete the on-call tracking logs and submit them to their manager.[22]

Plaintiff testified about the protocol for working on call.  When she received a phone call from a provider requesting a member transfer, she was responsible for contacting the hospital to get the clinical information related to the transfer, entering the information into CGX for Humana's regional medical director to approve the transfer, and providing an answer to the hospital providing authorization for whether the member can transfer.  Plaintiff was responsible for documenting the member's name, the reason the member was in the hospital, the member's past medical history, and specify the necessary criteria for the member to be transferred to the

---

[22]Doc. 57, Ex. 19.

next level of care.  Once the necessary documentation is entered into CGX, the case file should be routed to Humana's regional medical director for a decision regarding the transfer.  At the conclusion of on-call hours, any cases called in after hours are transferred from the on-call nurse to the appropriate case management nurse via CGX according to the assigned facility.

Plaintiff served as on-call nurse September 21 through 24, 2012.  From September 22 through 23, CGX was unavailable due to a scheduled system upgrade.  Plaintiff testified that she received several calls that weekend and told all facilities that her computer system was down, she was unable to assist them, and they should call back the following Monday.  While on call, Plaintiff received a call from Research Medical Center regarding a member in need of a transfer from patient acute care to a skilled nursing facility.  Plaintiff testified that she does not remember getting the call from Research Medical Center because at the time, she was "in a manic state."

Bolton testified that despite any CGX system issues, Plaintiff should have requested that Research Medical Center fax her the information necessary to review the clinical information with Humana's regional medical director and provide the facility with a response with respect to the member's transfer.  Watkins and Bolton further testified that despite any CGX issues, Plaintiff was responsible for contacting Humana's regional medical director—via phone, fax, or email—to provide the necessary clinical information to effect the member's transfer.  Plaintiff did not contact Humana's regional medical director by any of those means to obtain authorization for the member to be transferred from Research Medical Center, and testified that it was her understanding that everything had to be processed through CGX.

CGX was back up and running by the morning of September 24, 2012.  According to Watkins, once the system was back online, it was Plaintiff's responsibility to log into CGX and chart the information from any calls received during her time on call.  In addition, once the

system was back online, Plaintiff was responsible for routing information to the regional medical director to effect the member's transfer to the appropriate facility.  Plaintiff failed to document the member's file on the morning of September 24, and failed to route the necessary information to the regional medical director for the member's transfer.  Plaintiff was required to complete an on-call tracking log and submit the same to Watkins.  Although she wrote down the names of members for whom she received calls over the weekend, she never provided the information to Watkins or any other case management nurse because Watkins never asked her for a copy of her notes.   Plaintiff testified that because she failed to provide Watkins or the case management nurses with this information, the cases for those members were not entered into the CGX system.  When asked why she failed to provide the information, Plaintiff testified that she could not do so because she was in a manic state at the time.

On September 25, 2012, Humana's on-site nurse for Research Medical Center, Cindy Latz, contacted Plaintiff to ask about the member whose case had been called in on September 22.  Latz inquired as to whether the regional medical director approved the member's transfer.  Plaintiff indicated no approval had been issued for the member.  Latz followed up with Plaintiff about the member's case file on September 27, 2012, and told Plaintiff that the corporate office opened a case in CGX for the member.  Because Plaintiff worked the call over the weekend, Latz requested that she document the case, including inserting details about the system being unavailable on September 22, and taking the case from a pending to inpatient status.  In her response, Plaintiff indicated that she "couldn't remember the time," and that she "told the provider she could not help due to computer problems."[23]  Watkins testified that once Plaintiff was notified that a case had been opened for the member, Plaintiff should have charted the

---

[23]Doc. 57, Ex. 21.

member's file as to the events on September 22, taken the case from pending to inpatient status, inserted any nurse's notes, and submitted the case to the regional medical director for review of the transfer request.  As a result of Plaintiff's failure to take any of these actions, the case was not worked for approximately ten days.

Watkins testified that other than Plaintiff, no utilization nurse has ever left a member's case file unworked for multiple days.  Watkins is not aware of any other nurse who was on call and failed to contact the regional medical director and obtain approval for a member's transfer, or of any nurse who was on call and failed to chart for a period of ten days an event that fell within their responsibility.

### Termination of Plaintiff's Employment

On October 2, 2012, Latz notified Watkins that the member at issue had not been transferred and that neither "rounding" nor charting had been done on the member.  That day, Watkins received a complaint from Research Medical Center regarding Plaintiff's failure to assist with the member's transfer from acute care to skilled nursing.  Watkins testified that she went into CGX to check the member's file and found no notes or activity from Plaintiff.  The next day, Watkins consulted with Bolton about terminating Plaintiff's employment.

On October 4, 2012, Watkins spoke with Plaintiff about the member's file and during the conversation, Plaintiff stated that "it was a bad weekend," and she "didn't do anything" on the case.[24]  Neither Watkins nor Bolton were aware of any other similarly situated nurses who failed to serve a member's needs while on call who were not terminated.  Upon learning of Plaintiff's failure to serve the member's needs while on call, Bolton recommended that Watkins move forward with contacting HR4U to begin the process of terminating Plaintiff's employment.

---

[24]Doc. 57, Ex. 22.

Watkins then spoke to Chester about Plaintiff and Chester recommended that Plaintiff's employment be terminated.  Chester testified that by not doing her due diligence to take care of the member, Plaintiff failed to meet the expectations of her role as required by the CCIP, and she provided Watkins with the Termination of Employment Memo.  Chester testified that Human Resources Director Eric Talb was informed of the circumstances surrounding Plaintiff's impending termination because it was unclear whether Plaintiff was a member of the nurses' union, but that Talb was not a participant in the decision to terminate Plaintiff.

On October 8, 2012, Watkins, along with Bolton and Human Resources Consultant Jamie Meyer (who participated via telephone in Chester's absence), met with Plaintiff and notified her that Humana was terminating her employment, effective immediately.  Humana gave Plaintiff the memorandum detailing the basis for its decision to terminate her employment.[25]

## III.    Discussion

Plaintiff asserts two claims that her rights were violated under the ADA: 1) her termination was discriminatory (Count I),  and  2) her termination was retaliatory (Count II).[26]  The Court discusses each in turn.

### A.  Discrimination

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability"[27]  To establish a prima facie case of employment discrimination under the ADA,

---

[25]*Id.*, Ex. 23.

[26] In the Pretrial Order, Plaintiff's legal claims are stated as "1. Defendant denied Plaintiff reasonable accommodations pursuant to her rights under the ADA, and terminated her, in violation of her right to be free of disability discrimination under the ADA (Count I)" and "2. Defendant denied plaintiff reasonable accommodations pursuant to her rights under the ADA, and terminated her, in violation of her right to be free of retaliation under the ADA (Count II)." Doc. 55 at 7.  Although Humana moved for summary judgment on Plaintiff's failure to accommodate claim, Plaintiff failed to address any separate putative claim for failure to accommodate in its response, and thus has abandoned that claim.  *See Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768–69 (10th Cir. 2001); *Walker v. Faith Techs., Inc.*, 344 F. Supp. 2d 1261, 1270 (D. Kan. 2004).

[27]42 U.S.C. § 12112(a).

Plaintiff must present evidence that (1) she is disabled within the meaning of the ADA; (2) she is qualified to perform the essential functions of her job with or without accommodations; and (3) she was terminated under circumstances that give rise to an inference that the termination was based on her disability.[28]  "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee."[29]  The court does not look to the plaintiff's subjective evaluation of the situation.[30]

Plaintiff attempts to meet this burden by presenting circumstantial evidence of discrimination, requiring application of the familiar *McDonnell Douglas* burden-shifting framework.[31]  Thus, Plaintiff must first submit evidence from which a reasonable jury could conclude that a prima facie case of discrimination has been established.  Humana must then offer sufficient evidence of a legitimate, nondiscriminatory reason for its action.[32]  If Humana does so, Plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext designed to mask discrimination.[33]  Although the burdens of production shift, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.[34]

Humana urges that Plaintiff has failed to prove any of the elements of her prima facie claim, and that even if she could, the record is clear that its decision to terminate Plaintiff's employment is not a pretext for discrimination.

---

[28]*Smothers v. Solvay Chem., Inc.*, 740 F.3d 530, 544 (10th Cir. 2014).

[29]*Tesh v. U.S. Postal Serv.*, 349 F.3d 1270, 1272 (10th  Cir. 2003) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 45 U.S. 248, 254 (1981)).

[30]*E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1044 (10th Cir. 2011) (citation omitted).

[31]*See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1141 (10th Cir. 2011).

[32]*Carter*, 662 F.3d at 1141.

[33]*Id.*

[34]*Id.*

### 1.  Disability

Under the ADA, "[t]he term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such impairment."[35] Because Plaintiff does not contend that she had a record of an impairment or that Humana regarded her as impaired, her sole claim is one for actual impairment under paragraph (A).  Thus, she "must (1) have a recognized impairment, (2) identify one or more appropriate major life activities, and (3) show the impairment substantially limits one or more of those activities."[36]

As acknowledged by Humana, the 2008 amendments to the ADA make the establishment of a disability easier for plaintiffs.  Plaintiff must present sufficient evidence to prove (1) that she has a condition (bipolar disorder) (2) that substantially limits at least one of her identified major life activities.[37]  Whether or not an impairment "substantially limits" a major life activity "is not meant to be a demanding standard," and "should not demand extensive analysis."[38]  To show that her bipolar disorder substantially limits her ability to perform these major life activities, Plaintiff must show that she is substantially limited in her ability to perform the major life activity "as compared to most people in the general population."[39]  This analysis requires an "individual assessment,"[40] and bipolar disorder is generally concluded to substantially limit "brain function."[41]  "A medical diagnosis is insufficient; rather, the ADA requires a plaintiff to offer evidence that the extent of the limitation cause by her impairment in terms of their own

---

[35]42 U.S.C. § 12102(1).

[36]*Carter*, 662 F.3d at 1142 (internal quotation marks and citation omitted).

[37]*Felkins v. City of Lakewood*, 774 F.3d 647, 651 (10th Cir. 2014).

[38]29 C.F.R. § 1630.2(j)(1)(i),(iii).

[39]29 C.F.R. § 1630.2(j)(1)(ii).

[40]*Id.* § 1630.2(j)(1)(iv).

[41]*Id.* § 1630.2(j)(3)(iii).

experience is substantial."[42]

Here, Plaintiff identifies her disabling impairment as bipolar disorder.  In both the Petition and the Pretrial Order, she alleges that she "possessed bipolar disorder, which substantially impairs one or more of her major life activities."[43]  The question the Court must resolve is whether Plaintiff has met her prima facie burden of showing that her impairment substantially limits the identified major life activities.  It was not until her Declaration submitted in opposition to Humana's Motion for Summary Judgment that Plaintiff identified those major life activities as sleeping, concentrating, thinking, communicating, and working with others.[44]

Humana argues that Plaintiff's failure to offer a specific medical diagnosis or testimony from a treating physician or psychiatrist to support her claim that she has bipolar disorder is fatal to her claim that she had a mental impairment that would qualify as a disability under the ADA. The Court agrees.  While there is no dispute that bipolar disorder is a recognized impairment under the ADA, Plaintiff offers as evidence of her disability only her own declaration that she has "in the past received a diagnosis of Bipolar Disorder for [her] symptoms."[45]  Plaintiff  has not designated any physician as an expert witness in this case, nor proffered any medical evidence or diagnosis of bipolar disorder.  While Plaintiff is correct that the ADAAA was enacted to broaden the definition of "disability" to remove any judicially created constraints on coverage under the ADA, she has cited no authority suggesting that the ADAAA "so broadened the definition of 'disability' that a plaintiff can be deemed disabled based only on self-diagnosis

---

[42]*Wilkerson v. Shinseki*, 606 F.3d 1256, 1262 (10th Cir. 2010).

[43]Docs. 1, 55.

[44]Doc. 60, Ex. 6.

[45]*Id.*

of a [mental] impairment."[46]

Both parties cite the recent Tenth Circuit decision in *Felkins v. City of Lakewood*.[47] Plaintiff argues that under *Felkins*, she is relieved of the obligation to provide expert testimony; by contrast, Humana argues that under *Felkins*, Plaintiff's declaration alone is insufficient evidence of her diagnosis.  In *Felkins*, the Tenth Circuit specifically rejected an ADA plaintiff's attempt to establish the existence of a physical impairment only by self-diagnosis of an impairment.[48]  The Tenth Circuit made it clear that the plaintiff "had to present sufficient evidence to prove that she had a condition (namely, avascular necrosis) that substantially limited at least one of her five identified major life activities."[49]  As evidence of her disability, the plaintiff presented her own declaration in which she stated that she had avascular necrosis, and that the condition caused difficulties with walking, standing, and lifting, and that it caused her femur to fracture.[50]  The court held that while the plaintiff's "declarations are admissible insofar as they describe her injuries and symptoms, such as pain and difficulties walking, standing, and lifting," they are "inadmissible, however, insofar as they diagnose her condition as avascular necrosis or state how that condition causes limitations on major life activities," explaining that "those are clearly matters 'beyond the realm of common experience . . . and require the special skill and knowledge of an expert witness."[51]  The court rejected the plaintiff's argument that the ADA amendments of 2008 lowered the standard of proof for disability claimants and relieved

---

[46]*Jennings v. AAON, Inc.*, No. 14-CV-0347-CVE, 2015 WL 3465834, at *6 (N.D. Okla. June 1, 2015) (citation omitted).

[47]774 F.3d 647 (10th Cir. 2014).

[48]*Id.* at 651–52.  The case was decided after enactment of the ADAAA and the court specifically references the ADAAA.

[49]*Id.* at 651.

[50]*Id.*

[51]*Id.* at 652 (quoting *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1214 (10th Cir. 2011)) (internal quotation marks omitted).

their obligation to provide expert testimony, explaining that while no expert testimony is required to show that the comparison of an individual's performance of a major life activity to that of most people in the general population, "plaintiff has not provided proper evidence that any limitation she may have is *caused* by avascular necrosis."[52]

Such is the case here.  The Court finds that, even if Plaintiff were permitted to testify that she has bipolar disorder, a reasonable factfinder could not conclude that she suffers from this particular impairment without a specific medical diagnosis or testimony from a treating physician or mental health professional.  Moreover, Plaintiff was on notice of the need to provide admissible evidence after Humana challenged her status as disabled in its memorandum in support of summary judgment.[53]  As the court noted in *Felkins*, in response to Humana's motion, it is Plaintiff's burden to "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for [her]."[54]  Plaintiff has not satisfied this burden.[55]

## 2.  Pretext

Even assuming for purposes of summary judgment that Plaintiff has met the burden of proving her prima facie case, however, her claim fails as a matter of law because she cannot

---

[52]*Id.*

[53]Doc. 57 at 35–38.

[54]*Felkins*, 774 F.3d at 653 (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)).

[55]*Id.*; *see Diaz v. Saucon Valley Manor Inc.*, 579 F. App'x 104, 106 (3d Cir. 2014) (contrasting disability of alcoholism, which requires no medical evidence, with "some medical condition involving the central nervous system [that] nobody can pronounce"); *Grabin v. Marymount Manhattan Coll.*, No. 12 Civ. 3591 (KPF), 2015 WL 4040823, at *11–12 (S.D.N.Y. July 2, 2015) (requiring specific medical diagnosis or testimony that plaintiff suffered from thalassemia, a blood disorder); *Jennings v. AAON, Inc.*, No. 14 Civ. 347 (CVE), 2015 WL 3465834, at *6 (N.D. Okla. June 1, 2015) (rejecting the "self-diagnosis of an impairment," and noting that plaintiff's "lay opinion [regarding] a mold allergy is inadmissible and . . . is not an acceptable substitute for medical evidence or the testimony of a medical expert").

establish that her termination was based on her alleged disability.[56]

Humana's burden to articulate a legitimate, nondiscriminatory reason for Plaintiff's termination is not onerous.[57]  When Humana terminated Plaintiff, the stated reason for the termination was the failure to meet established expectations as set forth in the September 9, 2012 CCIP.[58]  As discussed above, Humana cited Plaintiff's failure to review and update a member's case while working on call the weekend of September 21, 2012.  These justifications, which on their face are legitimate and non-discriminatory, satisfy Human's "exceedingly light" burden.[59]  Plaintiff contends that her acts were done while she was in "a manic state, and thus Humana erred in finding she acted intentionally.  The Court's task, however, is not to "ask whether the employer's decision was 'wise, fair or correct, but whether [it] honestly believed [the legitimate, nondiscriminatory] reasons [it gave for its conduct] and acted in good faith on those beliefs.'"[60]  The burden thus shifts to Plaintiff to show Humana's proffered reasons were pretextual.

Pretext can be inferred from evidence revealing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation for termination.[61]  Typically, a plaintiff attempts to demonstrate pretext in one or more of three ways:

> (1)With evidence that the defendant's stated reason for the adverse
> employment action was false, (2) with evidence that the defendant acted
> contrary to a written company policy prescribing the action to be taken by

---

[56]*E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1043 (10th Cir. 2011) (assuming, without deciding, that the plaintiff had established a prima facie discriminatory termination claim under the ADA) (citation omitted).

[57]*Dewitt v. S.W. Bell Tele. Co.*, 41 F. Supp. 3d 1012, 1018 (10th Cir. 2013) (citing *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1279 (10th Cir. 1999)).

[58]Doc. 57, Ex. 23.

[59]*Goodwin v. Gen. Motors Corp.*, 275 F.3d 1005, 1013 (10th Cir. 2002) (quoting *Sprague v. Thorn Ams., Inc.*, 129 F.3d 1355, 1363 (10th Cir. 1997)).

[60]*Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010) (quoting *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 925 (10th Cir. 2004)).

[61]*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).

the defendant under the circumstances, or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.[62]

Here, Plaintiff's attempts to demonstrate that Humana's proffered reasons for her termination are pretextual fall short, as she relies on her own subjective beliefs, speculation, and conjecture.  Plaintiff argues that Humana's identification of the decision-makers on her termination is inconsistent.  Plaintiff argues that Humana identified in discovery three different sets of managers who were decision-makers in her termination, and that Eric Talb was involved in the decision to terminate her employment.  It is undisputed, however, that Watkins, Bolton, and Chester were the only decision-makers in Plaintiff's termination.  Specifically, in October 2012, after learning that Plaintiff failed to take care of a member's needs, Watkins (Manager of Health Services), discussed the issue with Bolton (Director of Health Services), who recommended contacting Chester (Human Resources Consultant) to get guidance regarding moving forward with termination.  Watkins merely consulted with Eric Talb (Human Resources Director) about whether Plaintiff's termination would trigger any obligations under a collective bargaining agreement.  The record shows that Chester recommended Plaintiff's termination and provided Watkins with the content of the termination letter.  Moreover, the record shows that on October 8, 2012, the day Plaintiff was notified of her termination, Chester was out of the office and Janice Meyer attended the termination meeting in her place as a witness.  Plaintiff's assertion that anyone other than Watkins, Bolton, and Chester made the decision to terminate her employment is mere speculation and conjecture, unsupported by the record.

Next, Plaintiff contends that Humana failed to follow its progressive disciplinary process

---

[62]*Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 714 (10th Cir. 2014) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)) (quotations and citations omitted).

in her case during the summer and fall of 2012.  She argues that Humana's policy calls for a progressive discipline process of verbal counseling and two coachings before being placed on CCIP, and that no coaching occurred in the summer of 2012.  As Bolton testified, however, with the exception of critical, *i.e.* terminable, offenses, Humana uses the progressive discipline and counseling process described by Plaintiff.  It is undisputed, however, that Plaintiff's behavior at the Summit in August 2012 was a terminable offense, and that Humana could have terminated her employment then without any additional warnings or progressive disciplinary action.  Instead, Humana offered Plaintiff a CCIP in lieu of termination.  Thus, the only deviation in Humana's disciplinary policy, if any, occurred when it offered her the last-chance CCIP.  Plaintiff has failed to point to any evidence to demonstrate that that any deviations in Humana's disciplinary policy occurred to allow for an inference of pretext.

Finally, Plaintiff urges that her termination arose from a matter that was not of her making, and that she properly dealt with the CGX outage.  Plaintiff argues that she handled the CGX outage as best she could, took note of the caller names, and discussed the matter in full with Watkins in a timely fashion.  Plaintiff further alleges that she understood her actions to be proper, and that her termination was without foundation.  The undisputed evidence shows, however, that Plaintiff failed to take care of a member's needs, and failed to document the member's information into CGX despite having access to fax and email independent of CGX during the scheduled outage.  Even if she did not have access to fax and email, Plaintiff clearly had a telephone available to her that weekend because she was receiving calls about members while on-call, yet she admittedly never attempted to call the regional medical director to obtain approval to transfer the member at issue.  It is further uncontroverted that even after CGX was back online, Plaintiff neglected the member's case, and continued to ignore the case even after a

fellow nurse requested that she document the necessary information in CGX.  Because of Plaintiff's inaction, the member's file was not worked for ten days, without an update to the clinical notes, chart information, and other necessary documentation.  As Humana notes, Plaintiff's actions and inactions occurred approximately one week after she was placed on the last-chance CCIP, which notified Plaintiff that failure to meet expectations while on CCIP would result in termination.  Plaintiff's speculation and conjecture as to Humana's reason for her termination is insufficient to create an inference of discriminatory intent.

In sum, nothing in these facts or the record gives rise to an inference that Humana's stated reason of job misconduct is a pretext for intentional discrimination on the basis of Plaintiff's bipolar disorder.  The record, viewed in the light most favorable to Plaintiff, fails to disclose a genuine issue of material fact regarding prextext.  Summary judgment is appropriate on Count I.

### B.  Retaliation

A prima facie case of retaliation under the ADA requires: "(1) that [an employee] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."[63]  "If a plaintiff establishes these factors, the employer has the burden of showing it had a legitimate, nondiscriminatory reason for the adverse action."[64]  "If the employer can do so, the burden shifts back to the plaintiff to prove pretext, which requires a showing that the proffered non-discriminatory reason is unworthy of belief."[65]

---

[63]*E.E.O.C. v. Picture People, Inc.*, 684 F.3d 981, 988 (10th Cir. 2012).

[64]*Id.*

[65]*Id.* (internal citation and quotation marks omitted).

The Court will assume for purposes of summary judgment that Plaintiff satisfies the requirements of a prima facie case of retaliation.  The burden therefore shifts to Humana to articulate a legitimate, nondiscriminatory reason for the discharge.  As discussed above, Humana states that Plaintiff was terminated while on a CCIP for failure to meet established expectations arising from her failure to follow protocol regarding a member's case while working on call the weekend of September 21, 2012.  Because this is a legitimate, nondiscriminatory reason for termination, the burden shifts back to Plaintiff to demonstrate that the proffered explanation is a pretext for retaliation.  As with her discrimination claim, however, Plaintiff's attempts to demonstrate that Humana's proffered reasons for her termination are pretextual fall short.

Plaintiff first argues the timing of her termination, shortly after her request for intermittent FMLA leave, allows a jury to infer that Humana's reasons were pretextual.  On September 20, 2012, she contacted UNUM to request FMLA leave; on October 4, 2012, she was fired.  The Tenth Circuit has noted, however, that a temporal nexus may actually weigh against a finding of pretext where, as here, an employer acts in response to specific and continuing disciplinary problems.[66]  Humana placed Plaintiff on CCIP on September 14, 2012, after her inappropriate behavior at the Summit.  Plaintiff failed to follow protocol while on call the weekend of September 21, 2012, and her failure to act resulted in a member's case going untouched for ten days.  The situation was brought to Watkins' attention on October 2, 2012, when another Utilization Nurse notified Watkins and she received a complaint from Research Medical Center.  Watkins consulted with HR4U and Plaintiff was fired October 8, 2012.  These intervening events defeat any inference of retaliation because Humana's concerns about Plaintiff's behavior predate her request for intermittent leave.  The September 14, 2012 CCIP

---

[66]*Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006).

was implemented in lieu of termination for Plaintiff's conduct at the Summit, and was specifically offered as a "final, one-time opportunity to continue your employment" and that further incidents could result in termination.[67]  Thus, the timing of Plaintiff's termination undermines any claim of pretext by strongly suggesting that Humana acted in response to specific and continuing disciplinary and performance problems.[68]

Plaintiff's additional allegations of pretext mirror those raised in her discrimination claim, and do not raise a triable issue of pretext for purposes of her ADA retaliation claim. Because Plaintiff has failed to raise a genuine issue of material fact as to whether Humana's stated reason for the termination are a pretext for retaliation, summary judgment is appropriate on Count II.[69]

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment (Doc. 56) is GRANTED; Plaintiff's case is dismissed in its entirety.

**IT IS SO ORDERED.**

Dated: <u>March 10, 2016</u>

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[67]Doc. 57, Ex. 18.

[68]*Argo*, 452 F.3d at 1203.

[69]Because the Court grants Defendant's motion for summary judgment on the merits of both claims, it does not reach the alternative argument that Plaintiff's damages are limited by the after-acquired evidence doctrine alleging falsification of her employment history.