**FILED**
**United States Court of Appeals**
**Tenth Circuit**

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**January 5, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

---

KAREN POULSEN,

   Plaintiff - Appellant,

v.

HUMANA INSURANCE COMPANY, a Wisconsin corporation,

   Defendant - Appellee.

No. 16-3075
(D.C. No. 2:14-CV-02477-JAR)
(D. Kan.)

---

## ORDER AND JUDGMENT[*]

---

Before **TYMKOVICH**, Chief Judge, **PHILLIPS** and **McHUGH**, Circuit Judges.

---

Karen Poulsen appeals the district court's entry of summary judgment for Humana Insurance Company (Humana) on her retaliation claim under the Americans With Disabilities Act, 42 U.S.C. § 12203(a) (ADA). The sole issue we must resolve is whether Humana's stated reason for terminating her employment was pretextual. We agree with the district court that there is no genuine issue of material fact

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

concerning this issue and that Humana is entitled to judgment as a matter of law. We therefore affirm the entry of summary judgment.

## BACKGROUND

### Ms. Poulsen's Employment with Humana

Humana employed Ms. Poulsen at its Overland Park, Kansas office from August 26, 2007 until her termination date, October 8, 2012. Beginning in 2009, her title was Utilization Management (UM) Nurse. Her position was terminable at will. Her responsibilities included providing Humana's insureds (known as members) with guidance pertaining to their health care needs, keeping track of them when they were hospitalized, assisting them with discharge from the hospital and transfers to other facilities, and presenting information to the medical director regarding their appropriate level of care.

Humana uses progressive discipline and counseling for its employees and has implemented a Competency Improvement Plan Guide for dealing with employee behavior, performance, and attendance issues. Depending on the egregiousness of an incident, employees may receive coaching as a first step. If coaching does not resolve the problem, an employee may be placed on a "Competency and Contribution Improvement Plan" (CCIP). An employee who fails to comply with the CCIP's requirements may be terminated.

### Ms. Poulsen's Noise Complaints

Ms. Poulsen asserts that she suffers from bipolar disorder, which causes her to experience bouts of depression and anxiety along with periods of mania. She claims

this condition affects her major life activity of sleeping, leading her to be exhausted during working hours and to require a quiet work environment. She also asserts that during her manic periods she loses the ability to function cogently around others.

Throughout her employment with Humana, Ms. Poulsen frequently complained to her supervisors about the level of noise in the workplace. She did not mention that her sensitivity to noise was caused by bipolar disorder. Instead, she attributed it to her stress level. Due to her complaints she was assigned to a quieter area of the office.

**Ms. Poulsen's Behavior at Humana's 2012 Summit**

In August 2012, Humana held its "All Hands Summit" (Summit), a conference during which nurses from throughout Humana's central region traveled to its location in Overland Park for training and team building. On the first day of the Summit, some of the visiting nurses set up their workstations in empty cubicles adjacent to Ms. Poulsen's work space. Ms. Poulsen was attempting to work on a time-sensitive portion of her caseload. The nurses carried on a forty-five minute conversation over the cubicles. Ms. Poulsen asked them to be quiet. When they kept talking, she stood up and loudly shouted, "Shut up!"

Ms. Poulsen was taken to a conference room along with supervisors Michelle Watson and Kathy Watkins. Ms. Poulsen was pacing, her hair was disheveled, and she appeared to be very upset. She did not mention bipolar disorder, but suggested that "maybe her medication needed to be adjusted and that her diet pill [might] be too strong." Aplt. App., Vol. 2 at 456 (internal quotation marks omitted). Ms. Watkins

told Ms. Poulsen that her behavior was inappropriate for the workplace and that she should apologize to the other nurses. She apologized and was sent home for the day.

The Summit continued two days later at a nearby hotel ballroom, where employees participated in an icebreaker exercise. Participants were asked to stand in front of the group and provide information about themselves, including something the group did not know about them. Humor was acceptable.

Ms. Poulsen testified that when it was her turn to speak, she was in a manic state. Her participation in the exercise did not go well. She made several inappropriate and unprofessional comments of a personal nature that left coworkers uncomfortable.

Ms. Watkins contacted Humana's corporate human resources department for guidance about how to discipline Ms. Poulsen for her outburst to the visiting nurses and her inappropriate and unprofessional comments during the icebreaker exercise. Christine Chester, a human resources consultant, determined that Ms. Poulsen's behavior constituted a terminable offense, but she recommended in lieu of termination that Ms. Poulsen be offered a CCIP.

On September 14, Ms. Watkins and Ms. Bolton met with Ms. Poulsen to inform her that in lieu of termination, she was being placed on a CCIP. Among other terms of the CCIP, she would be required to actively participate in Humana's EAP, Life Sync, which provides behavioral health counseling. The CCIP provided that failure to comply with its requirements would result in termination of her

4

employment, and that failure to meet the other expectations of her role on an ongoing basis could also result in termination.

### Ms. Poulsen's Application for FMLA Leave

On September 18, Ms. Poulsen met with her family physician. They discussed the stress of her work environment. He provided her with a note explaining that she had bipolar disorder. Ms. Poulsen never gave the note to anyone at Humana, but planned to do so once she was approved for leave under the Family Medical Leave Act (FMLA).

Humana's FMLA program is handled by UNUM, a third-party administrator. Ms. Poulsen contacted UNUM to request intermittent FMLA leave. Because UNUM handles Humana's FMLA program, her supervisors had no involvement with the FMLA application process, other than receiving notice that Ms. Poulsen had applied for leave.

UNUM notified Ms. Poulsen that she needed to return a medical certification from her doctor by October 5, 2012, in order for her FMLA leave request to be approved. She later received an extension until October 12 to provide the documentation. But before she could do so, her employment was terminated on October 8.

### Events Leading to Ms. Poulsen's Termination

As a UM Nurse, Ms. Poulsen had the option to work on-call on evenings and weekends. While serving on call, she was required to answer pages from Humana's

5

answering service, document information on Humana's computer system—known as CGX—and complete on-call tracking logs and submit them to her manager.

On-call employees sometimes received phone calls requesting that a Humana member be transferred from a hospital to a different facility. When this happened, the on-call employee was responsible for contacting the hospital to get the clinical information related to the transfer, entering the information into CGX so that Humana's regional medical director could approve the transfer, and following up with the hospital concerning authorization for the transfer.

Ms. Poulsen served as a weekend on-call nurse from September 21 through 24, 2012. On September 22 and 23, CGX was unavailable due to a scheduled system upgrade. Ms. Poulsen received several calls that weekend. She told the facilities that contacted her that her computer system was down and she was unable to assist them. She testified that she asked each caller if theirs was an expedited request. When told that is was not, she informed them they should call back the following Monday.

One of the calls Ms. Poulsen received, but failed to offer assistance for, was from Research Medical Center (RMC), regarding a member who needed to transfer from patient acute care to a skilled nursing facility. Ms. Bolton testified that in spite of the problems with CGX, Ms. Poulsen should have asked RMC to fax her the information necessary to review the member's proposed transfer with Humana's regional medical director and to provide RMC with a response concerning the transfer. Also, despite the CGX issues, Ms. Poulsen should have contacted the

regional medical director—via phone, fax, or email—to provide the clinical information needed for the member's transfer.

Ms. Poulsen did not contact the regional medical director through any of these means. She testified it was her understanding that the problems with CGX had relieved her of further responsibility in the matter, and that everything had to be processed through CGX in any event. She also testified that because the system was down, she "couldn't receive faxes, and . . . could not send anything to the medical director." Aplt. App., Vol. 2 at 441.

CGX became available again on September 24. According to Ms. Watkins, when Ms. Poulsen came into the office after the on-call incident, she should have immediately notified Ms. Watkins that there was a patient who had not been properly transferred due to the CGX outage.[1] Although Ms. Poulsen had written down the names of the members for whom she received calls and notified Ms. Watkins of this fact, she never provided this information to Ms. Watkins or any other case management nurse. She explained that Ms. Watkins never asked her for a copy of her notes.

---

[1] Ms. Poulsen disputes Ms. Watkins' representations concerning her duties once the CGX system became available. *See* Aplt. App., Vol. 2 at 268. She states she "assumed" that Ms. Watkins's email concerning the system outage had relieved her from any further responsibilities concerning the Humana member she had failed to serve. *See id.* at 268, 440. This assumption on her part is insufficient to demonstrate pretext.

7

On September 25, Humana's on-site nurse for RMC, Cindy Latz, contacted Ms. Poulsen to ask whether the regional medical director had approved the member's transfer. Ms. Poulsen confirmed that no approval had been issued.

On September 27, Ms. Latz informed Ms. Poulsen that the corporate office had opened a case file in CGX for the member. She suggested Ms. Poulsen should document the case file, providing details about the system being unavailable and taking the case from a pending to an inpatient status. Ms. Poulsen responded that she "couldn't remember the time" and that she "told the provider that [she] could not help him due to computer problems." Aplt. App., Vol. 1 at 246. She did not document the file.

Ms. Watkins testified that once the case was created in the CGX system, the file should have been charted, the case taken from pending to inpatient status, and any nurse's notes should have been inserted. Ms. Watkins later received a complaint from RMC concerning Ms. Poulsen's failure to assist with the member's transfer. On October 2, she checked the member's file and found no notes or activity from Ms. Poulsen. Ms. Watkins testified that other than Ms. Poulsen, she was unaware of any utilization nurse who failed to chart for a period of ten days concerning an event that fell within the nurse's area of responsibility.

After consulting with Ms. Bolton and Ms. Chester, Ms. Watkins began procedures to terminate Ms. Poulsen's employment. On October 8, Ms. Watkins, Ms. Bolton, and HR Consultant Jamie Meyer—who participated by telephone in Ms. Chester's absence—met with Ms. Poulsen and informed her that Humana was

terminating her employment, effective immediately. Ms. Poulsen was provided with a memorandum detailing the basis for Humana's decision.

## DISCUSSION

We review the district court's grant of summary judgment de novo, "view[ing] all evidence and draw[ing] reasonable inferences therefrom in the light most favorable to the nonmoving party." *Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1186 (10th Cir. 2016) (internal quotation marks omitted). "Summary judgment is only appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Id.* (internal quotation marks omitted).

Although her complaint alleged both discrimination and retaliation, on appeal Ms. Poulsen challenges the grant of summary judgment only on her retaliation claim. Because she relies on circumstantial evidence to prove her retaliation claim, we follow the analytical framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *Foster*, 830 F.3d at 1186.

> Under this framework, once the plaintiff establishes a prima facie case of retaliation, the employer has the burden of showing it had a legitimate, nondiscriminatory reason for the adverse action. If the employer can do so, the burden of production shifts back to the plaintiff to prove pretext, which requires a showing that the proffered nondiscriminatory reason is unworthy of belief.

*Id.* (brackets and internal quotation marks omitted).

The district court assumed for summary-judgment purposes that Ms. Poulsen had established a prima facie case of retaliation. We also will follow this approach.

9

The burden therefore shifted to Humana to articulate a legitimate, nondiscriminatory reason for Ms. Poulsen's discharge. Humana articulated such a reason: it claimed it terminated her employment because while she was already on a CCIP, she failed to follow protocol regarding a member's case when working on-call and afterwards failed to properly document the member's case file.

"A plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Id.* at 1194 (brackets and internal quotation marks omitted). "In establishing pretext, an employee can show the employer's proffered reason was so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief." *Id.* (internal quotation marks omitted). Typically, an employee demonstrates pretext in one or more of three ways:

> (1) [with] evidence that the defendant's stated reason for the adverse employment action was false; (2) [with] evidence that the defendant acted contrary to a written policy prescribing the action to be taken by the defendant under the circumstances; or (3) [with] evidence that the defendant acted contrary to an unwritten policy or contrary to the employer's practice when making the adverse employment decision affecting the plaintiff.

*Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 714 (10th Cir. 2014) (brackets, ellipsis, and internal quotation marks omitted).

Ms. Poulsen offers several reasons why a reasonable jury could disbelieve Humana's proffered explanation for her termination. She cites the close temporal proximity between the date she requested FMLA leave, September 20, 2012, and the date Humana terminated her employment, October 8. Notably, Ms. Poulsen's request

for FMLA leave was communicated to UNUM rather than her supervisors. She did not notify her supervisors that she sought leave as a form of accommodation for bipolar disorder. But even assuming her FMLA request qualified as a request for a reasonable accommodation under the ADA, the temporal proximity between the request and her termination is insufficient to establish pretext.

Ms. Poulsen's cited failure to work the member's case properly occurred after her FMLA application but shortly before her termination. At that point, she had been on a CCIP for a little over a week. Humana's concerns about her lack of professionalism predated the FMLA application, and were borne out by her intervening misconduct. These facts are sufficient to defeat any inference of retaliation created by the temporal proximity of the termination to her application for FMLA leave. As we held in a similar case, "the timing of the termination actually cuts against a finding of pretext by strongly suggesting that [the employer] acted in response to specific and continuing disciplinary problems." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006).

Ms. Poulsen challenges the applicability of the reasoning from *Argo* to her case. She first notes that the CCIP was "based on behaviors deemed erratic, but not necessarily detrimental in any substantive way to Humana's actual business dealings." Aplt. Opening Br. at 15. Her argument is unclear. If she is arguing that her behavior was insufficiently adverse to Humana's interests to justify a CCIP, we disagree. Humana's decision to require professional behavior by its employees in the workplace and at workplace-related events was not unreasonable and does not show

11

pretext. If she is arguing that the conduct that gave rise to the CCIP was too different from the conduct that resulted in her termination to represent a "specific and continuing disciplinary problem[]," *Argo*, 452 F.3d at 1203, we also disagree. Both forms of misconduct related to unprofessional behavior in the workplace, and the CCIP clearly informed her that she was required to comply with her job responsibilities.

Ms. Poulsen also argues that because the CCIP included a provision requiring her to obtain counseling, a reasonable jury could infer that her mental health condition drove the decision to terminate her employment, thereby making it more likely she was terminated for protected activity relating to that condition. But this attenuated argument fails to demonstrate that the reasons given for her termination were unworthy of belief. The mere fact that mental health issues were somehow involved in the chain of events that led to termination does not demonstrate pretext.[2]

Ms. Poulsen next argues that Humana has provided inconsistent accounts concerning which employees made the decision to terminate her employment. She points to evidence concerning the involvement of Humana employees Eric Talb, who was consulted about whether her termination would trigger any obligations under the nurses' collective bargaining agreement; Jamie Meyer, who attended the termination meeting in Ms. Chester's absence; Michelle Watson, who was informed of the

---

[2] She does not argue, for example, that the CCIP was itself issued in retaliation for protected activity. *Cf. Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324, 329 (10th Cir. 1996) (holding genuine issue of material fact existed concerning FLSA retaliation claim where, following protected activity, employer engaged in a series of escalating, retaliatory acts that created conditions for employee's termination).

12

termination decision as a new supervisor; and Stephanie Gramlick, with whom the decision was discussed.  But she fails to explain how any alleged inconsistencies in the witnesses' deposition testimony or answers to interrogatories concerning who was involved in the termination decision rise to the level of pretext.

Ms. Poulsen also charges Humana with pretext because it failed to follow its progressive disciplinary policy.  She complains she "was placed into a CCIP without benefit of a second written 'Coaching' as provided for in the . . . policy." Aplt. Opening Br. at 16.  But the disciplinary policy did not require that each progressive step be followed in the case of a "critical" offense, i.e., one which could result in immediate termination.  The conduct that resulted in Ms. Poulsen's CCIP constituted a critical offense, for which she could have been terminated.  Instead, she was given a final opportunity to remain employed with Humana by complying with the CCIP.  Ms. Poulsen was thus actually treated more favorably than the policy required.  Under these circumstances, any failure to provide a second written coaching does not demonstrate pretext.

Finally, Ms. Poulsen argues that she did not cause the CGX outage, and she responded properly to it.  She claims that "[s]he understood her responsibilities were fulfilled, and that the subject patient was not at all harmed by her action." *Id.* at 17.  But it is not her understanding that counts.  The relevant question is whether Humana honestly believed the nondiscriminatory reason it gave for firing her:  that she failed to fulfill her duties concerning a member who needed to be transferred, including adequately documenting the member's chart.  *See Johnson v. Weld Cty.*, 594 F.3d

13

1202, 1211 (10th Cir. 2010) ("Under *McDonnell Douglas*, our role isn't to ask whether the employer's decision was wise, fair or correct, but whether it honestly believed the legitimate, nondiscriminatory reasons it gave for its conduct and acted in good faith on those beliefs." (brackets and internal quotation marks omitted)). Ms. Poulsen has failed to demonstrate that Humana did not believe its explanation for her termination.[3]

## CONCLUSION

We affirm the district court's entry of summary judgment.

          Entered for the Court

          Timothy M. Tymkovich
          Chief Judge

---

[3] To support her pretext argument, Ms. Poulsen also cites an ADA discrimination case, *Carter v. Pathfinder Energy Services, Inc.*, 662 F.3d 1134, 1150 (10th Cir. 2011). The facts in *Carter* differ significantly from those here. In *Carter*, the plaintiff's supervisor told him at the time of termination that other employees who did not require an accommodation in their working hours would start quitting if he did not fire the plaintiff. *Id.* at 1141. He also incorrectly stated that the plaintiff was incapable of working 24-hour shifts like other employees. *Id.* Given these statements at the time of the plaintiff's termination, we concluded that he had produced enough evidence concerning pretext to survive summary judgment on his ADA discrimination claim. *See id.* at 1149-50. Ms. Poulsen does not point to statements of similar import that Humana's decision-makers made at the time of her termination. Hence, we do not find *Carter* persuasive under the facts of this case.